WARNER–LAMBERT COMPANY,
Plaintiff,

v.

TEVA PHARMACEUTICALS
USA, Defendant.

No. 99–CV–922.

United States District Court,
D. New Jersey.

Oct. 2, 2003.

---

Michael R. Clarke, Esq., Drinker, Biddle & Shanley, Florham Park, Robert L. Baechtold, Esq., Nicholas M. Cannella, Esq., Joseph M. O'Malley, Jr., Esq. (Argued), F. Christopher Mizzo, Esq (Argued)., Fitzpatrick, Cella, Harper & Scinto, New York City, for Plaintiff, Warner–Lambert Company.

Arnold B. Calmann, Esq., Robert B. Nussbaum, Esq., Saiber, Schlesinger, Satz & Goldstein, Newark, Albert E. Fey, Esq., W. Edward Bailey, Esq. (Argued), A. Joy Arnold, Esq. (Argued), Sasha G. Rao, Esq., John P. Hanish, Esq., Staci Levin Julie, Esq. (Argued), Fish & Neave, New York City, for Defendant Teva Pharmaceutical USA.

## *OPINION*

DEBEVOISE, Senior District Judge.

On January 15, 1999, defendant Teva USA ("Teva"), using a Federal Drug Administration ("FDA") procedure known as an Abbreviated New Drug Application ("ANDA") sought approval from the FDA to engage in the commercial manufacture, use and sale of a generic drug formulation containing the active ingredient quinapril hydrochloride. By filing its ANDA Teva was able to rely on portions of an FDA submission already on file for a corresponding branded formulation sold by plaintiff, Warner–Lambert Company ("Warner Lambert"). The FDA had approved Warner–Lambert's drug which is sold in the United States under the name Accupril and which is the subject of Warner–Lambert's U.S. Patent No. 4,743,450 ("the '450 patent").

In connection with its ANDA submission Teva filed a so-called "Paragraph IV Certification" with respect to the '450 patent, asserting that the '450 patent is invalid under 35 U.S.C. § 102 and 103. In response to notice of Teva's Paragraph IV

Certification and acting pursuant to statutorily prescribed procedures Warner–Lambert commenced this patent infringement action.

## I. *Background*

The '450 patent, which is entitled "Stabilized Compositions", issued on May 10, 1988 from patent application number 17,962 ("the '962 application"), filed February 24, 1987. The '450 patent is directed to stabilized compositions of certain Angiotension Converting Enzyme ("ACE") inhibitors. The ACE inhibitors of the '450 patent are prescribed for the treatment of hypertension. The problem that the '450 patent addresses is summarized in the section entitled "BACKGROUND":

> Certain ACE (Angiotension Converting Enzyme) inhibitors, which are useful as antihypertensives, are susceptible to certain types of degradation. Specifically quinapril and structurally-related drugs can degrade via (1) cyclization via internal nucleophilic attack to form substituted diketopiperazines, (2) hydrolysis of the sidechain ester group, and (3) oxidation to form products having often unwanted coloration.

Cyclization takes place when one part of the ACE inhibitor compound reacts with a different part of the same compound to form an altered, inactive "cyclized" compound. Hydrolysis is the reaction with water to form a hydrolysis degradation product. Oxidation forms products having unwanted coloration. The invention of the '450 patent resulted from Warner–Lambert's efforts to develop a stable dosage of its ACE inhibitor, quinapril hydrochloride ("quinapril") which was subject to degradation due to cyclization, hydrolysis and oxidation.

The invention as described in the '450 patent is: "It has been discovered that stable compositions containing ACE inhibitors of the type discussed above can be produced by using certain additives as stabilizers ..." For example: "The invention deals with: ... III. A method of making a pharmaceutical dosage form which comprises the step of including in the formulation suitable amounts of: (a) on ACE inhibitor, and (b) stabilizers which contain alkaline agents alone or alkaline agents in combination with saccharides (i.e., sugars) as one or more cyclization, hydrolysis, and discoloration inhibitor(s)."

The '450 patent sets forth seventeen claims, two of which are independent claims. The independent claims read:

### Claim 1

1. A pharmaceutical composition which contains:

(a) a drug component which comprises a suitable amount of an ACE inhibitor which is susceptible to cyclization, hydrolysis, and discoloration;

(b) a suitable amount of an alkali or alkaline earth metal carbonate to inhibit cyclization and discoloration, and

(c) a suitable amount of a saccharide to inhibit hydrolysis.

### Claim 16

16. A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:

(a) a suitable amount of alkali or alkaline earth-metal carbonate and,

(b) one or more saccharides.

On June 3 and 4, 2002 the court held a hearing in accordance with *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), *aff'g* 52 F.3d 967 (Fed. Cir.1995)(*en banc*). The most serious dispute concerned the construction of the phrase "an alkali or alkaline earth metal carbonate" as used in Claims 1 and 16 of the '450 patent. Teva

contended that "carbonate" encompasses "carbonate or bicarbonate." Warner–Lambert contended that the word means only a "carbonate" and does not include a bicarbonate. Ruling on these contentions the court held in its June 13, 2002 opinion that " 'an alkali or alkaline earth metal carbonate' as used in Claims 1 and 16 of the '450 Patent means the salt of an alkali metal or alkaline earth metal cation, and a carbonate ($CO_3^{-2}$) anion; it does not include a bicarbonate ($HCO_3^{-1}$) anion." (Slip Opinion at pp. 17, 18).

Of relevance to the motions now pending in the instant case is the disposition of a related action, *Schwarz Pharma, Inc., Schwarz Pharma AG and Warner–Lambert Company v. Teva Pharmaceuticals USA,* Civil No. 01–4995 (the "Schwarz Pharma Action"). On October 26, 2001 Schwarz Pharma, Inc. and Schwarz Pharma AG ("Schwarz Pharma"), as licensees of the '450 patent, filed a complaint alleging that Teva's moexipril product infringed the '450 patent.[1] Teva's accused moexipril hydrochloride formulation used sodium bicarbonate as an alkaline stabilizer. Teva contended that, applying the court's *Markman* ruling in the instant case, its formulation cannot literally infringe the claims of the '450 patent nor can its formulation infringe the claims of the '450 patent under the doctrine of equivalents. It moved for summary judgment on the ground of non-infringement.

Holding that Schwarz Pharma was not bound by the *Markman* ruling in the instant action to which it is not a party, the court considered Schwarz Pharma's contention that the phrase "an alkali or alkaline earth metal carbonate" as used in Claims 1 and 16 of the '450 patent encompasses a bicarbonate. The court held once again that "carbonate" does not include

bicarbonates and, therefore, Teva's accused product that contained a bicarbonate and not a carbonate did not literally infringe the '450 patent. The court also held that the accused product did not infringe the '450 patent under the doctrine of equivalents. These rulings resulted in an order granting Teva's motion for summary judgment in its favor on the ground of non-infringement.

Discovery proceeded in the instant case, and now Warner–Lambert and Teva have filed a number of interrelated motions for summary judgment and for other rulings.

## II. *The Motions*

Teva moves for a summary judgment that its accused quinapril hydrochloride formulation does not infringe claims 1, 4–10 or 12 of the '450 patent. It is Teva's contention that Warner–Lambert cannot establish that lactose in Teva's accused quinapril hydrochloride formulation inhibits hydroysis or that magnesium carbonate in its formulation inhibits cyclization and discoloration. Warner–Lambert counters with a motion for summary judgment of infringement of claims 1, 4–10, 12, 16 and 17 of the '450 patent. It further moves for summary judgment of validity.

Teva moves for summary judgment that the '450 patent is unenforceable due to Warner–Lambert's inequitable conduct. The alleged inequitable conduct is Warner–Lambert's intentional failure to disclose to the United States Patent and Trademark Office ("PTO") the existence of a preexisting drug that was directly material to the patentability of its claims, namely, Vasotec, an ACE inhibitor sold by Merck & Co. Warner–Lambert counters with a motion for summary judgment of "no inequitable conduct."

---

1. Schwarz Pharma named Warner–Lambert, the owner of the '450 patent, as a plaintiff in the Schwarz Pharma Action.

Further, Teva moves for an order granting it leave to amend its answer to add an additional unenforceability defense, namely, that during the prosecution of the '450 patent the patentees and the prosecuting attorney made material and intentional misrepresentations to the PTO concerning the inventorship of the '450 patented work. Finally, Teva moved for an order striking Warner–Lambert's defenses relating to Teva's allegations of inequitable conduct or, alternatively, for an order that Warner–Lambert has waived the attorney-client privilege by asserting these defenses.

Because there is no genuine issue of material fact with respect to infringement, Teva's motion for a summary judgment of non-infringement of claims 1,4–10 and 12 of the '450 patent will be denied. Warner–Lambert's motion for summary judgment of infringement of claims 1,4–10, 12, 16 and 17 of the '450 patent will be granted.

Because there are no genuine issues of fact with respect to the validity of claims 1,4–10 and 12 of the '450 patent, Warner–Lambert's motion for a summary judgment of validity as to those claims will be granted. The doctrine of judicial estoppel does not preclude Teva from contending that carbonates are interchangeable with bicarbonates despite the position Teva took in the *Schwartz Pharma* action. Because there are genuine issues of fact concerning the question whether a person of skill in the art would have found it obvious to substitute "an alkali or alkaline earth metal carbonate" for sodium bicarbonate, Warner–Lambert's motion for summary judgment of validity of claims 16 and 17 will be denied.

Merck's pre-existing Vasotec tablet, which was not disclosed to the PTO, was material in that a reasonable examiner would have considered the Vasotec product important in deciding whether to allow the application to issue as a patent. However, whether Warner–Lambert's inventors intended to deceive the PTO by withholding information concerning Vasotec raises questions of material facts. Therefore Teva's motion for summary judgment that the '450 patent is unenforceable due to Warner–Lambert's inequitable conduct and Warner–Lambert's motion for summary judgment of no inequitable conduct will be denied.

Teva's motion for leave to amend its answer to add another unenforceability defense and its motion to strike Warner–Lambert's defenses relating to Teva's allegations of inequitable conduct or, in the alternative, to rule that Warner–Lambert has waived the attorney-client privilege by asserting these defenses will be denied.

The seven motions before the court involve three general subjects: i) infringement, ii) validity and iii) enforceability in light of alleged inequitable conduct on Warner–Lambert's part before the PTO.

### III. *Summary Judgment Standards*

Under Fed.R.Civ.P. 56, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for judgment, the non-movant must set forth specific facts showing that there is a genuine issue for trial. "Mere denials or conclusory statements" by the party opposing summary judgment are insufficient to defeat summary judgment. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate in a patent case, as in any other case, where the requirements of Rule 56(c) are satisfied because there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Barmag,* 731 F.2d at 835.

## IV. *Infringement*

Each party has moved for summary judgment on the issue of infringement, Warner–Lambert seeking summary judgment of infringement and Teva seeking summary judgment of non-infringement. To show infringement of the claims of the '450 patent Warner–Lambert must prove by a preponderance of the evidence that Teva's quinapril formulations meet every element or limitation of those claims. *Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 532 (Fed.Cir.1996).

In its original answer, Teva admitted infringement of the '450 patent. This admission was based on the work that Teva had performed in connection with its formulations prior to submission of its ANDA to the F.D.A.

Teva later contended that facts developed during discovery demonstrated that the lactose used in its formulations does not inhibit hydrolysis, and, therefore, Warner–Lambert cannot prove that Teva's principal formulations are within independent claim 1 and dependent claims 4–10 and 12. This contention reflects the Court's *Markman* ruling:

> If a saccharide were used for some purpose other than inhibiting hydrolysis and did not inhibit hydrolysis or if an alkaline earth metal carbonate were used for some purpose other than inhibiting cyclization and discoloration and did not in fact inhibit cyclization and discoloration their use would not be within the scope of the claims.

> Hydrolysis is inhibited when there is achieved that degree of stability as

would secure regulatory approval of the drug product. (Slip Opinion at 16).

Teva moved to amend its answer to deny infringement. The Court granted the motion. Teva disclosed its lactose theory of non-infringement in its answers to contention interrogatories.

Claim 16 of the '450 patent, which is a process claim, does not ascribe any function to the saccharide. As stated in the Court's *Markman* opinion:

> The plain language of Claim 16 supports Warner–Lambert's interpretation of that Claim. It claims a process for stabilizing an ACE inhibitor *against cyclization.* Claim 16(b) does not include the phrase "a suitable amount" in conjunction with "one or more saccharides", thus omitting the link between the pharmaceutical component it is modifying and the referenced functional effect-preventing cyclization. It would be inappropriate to import from Claim 1 into Claim 16 a functionality that is not contained in Claim 16, namely, preventing hydrolysis. Only Claim 16(a), which recites "a suitable amount of an alkali or alkaline earth metal carbonate," plays a role in stabilizing against cyclization. (Slip Opinion at 17).

Thus Teva's lactose theory would not be a defense to a charge of infringement of claims 16 and 17. After discovery had closed and in connection with the pending summary judgment motions, Teva advanced a new ground to defend against the charge of infringement. This defense is directed to the limitation "a suitable amount of an alkali or alkaline earth metal carbonate to inhibit cyclization and discoloration." As to this limitation, the Court stated in its *Markman* opinion:

> ...... Evidence of those guidelines is simply to show that in 1987 there was a common understanding in the pharmaceutical industry about what would con-

stitute inhibition, i.e., stabilization of cyclization or discoloration.

"Inhibit", as used in Claim 1 means, as Warner–Lambert contends, that degree of stability as would secure regulatory approval of distribution of the drug product. It does not mean, as Teva argues, any lesser amount of stability. This meaning is derived from the claims and specifications and from the patent prosecution.

By the same token inhibition of discoloration as used in Claim 1 means similar minimization or elimination of an unwanted color change in the drug product ('450 patent, Col. 1, lines 11–12, 29–33). (Slip Opinion at 15).

Teva's most recently advanced defense against the charge of infringement (a contention not raised in its responses to contention interrogatories) is that Warner–Lambert has failed to demonstrate that the magnesium carbonate in Teva's accused quinapril formulations inhibits oxidative discoloration.

In short, in opposition to Warner–Lambert's motion for summary judgment of infringement and in support of its own motion for summary judgment of non-infringement, Teva contends: i) there is insufficient evidence to establish that the lactose in Teva's accused formulations inhibits hydrolysis; (ii) there is insufficient evidence to establish that the magnesium carbonate in Teva's accused formulations inhibits cyclization; (iii) there is no evidence to establish that the magnesium carbonate in Teva's accused formations inhibits oxidation; (iv) it is of no moment that Teva sought to formulate a tablet comparable to Accupril, because the proper comparison is with the '450 patent's claims limitations and not with Accupril, which Warner–Lambert has not established to be an embodiment of the patent.

Warner–Lambert has produced impressive evidence that Teva's quinapril formulations do in fact infringe the '450 patent. The fact that Teva admitted infringement in its original answer (filed April 26, 1999), is not controlling, because if newly discovered evidence demonstrates that the admission was an error, there is no reason why it should not be corrected. However, Teva's development of its formulation and its reports about the nature of its research which preceded or accompanied the submission of its ANDA to the FDA have major significance.

Teva's formulation development program was based upon a copying of the same incipients employed in Warner–Lambert's Accupril, including the use of magnesium carbonate and lactose, stabilizers used in the '450 patent's examples. Teva attempted a formulation that did not contain the saccharide lactose in order to compare its stability with formulations containing lactose. Teva's scientists concluded that the quinapril formulations prepared without lactose exhibited more hydrolysis at every stage than the other three lactose-containing formulations that Teva tested.

Thereafter, during its quinapril formulation development, Teva described the function of lactose in its formulations as being to inhibit hydrolysis. In its Final Development Report for 40 mg., 20 mg., 10 mg. and 5 mg. tablets, which was audited by the Regulatory Affairs Department at Teva, there appeared the following:

### EXCIPIENT SELECTION

1. Magnesium Carbonate, USP

This excipient serves as a filler; it was also determined that this excipient reacts with the active raw material (Quinapril HCI) to form a stable compound.

2. Lactose Monohydrate, NF

This excipient serves as a filler *and will also inhibit hydrolysis of the active raw material* (emphasis added).

As part of its quinapril ANDA application, Teva submitted an Excipient Functions Report. It stated with respect to Magnesium Carbonate, USP:

"[i]n addition to being a filler, Magnesium Carbonate, USP, was also determined to react with Quinapril Hydrochloride to form a stable compound."

The original Excipient Function Report stated with respect to lactose Monohydrate, NF: "Also inhibits hydrolysis of the raw material."

Notwithstanding the development work that Teva's scientists had performed, internal reports of the results of that work and representations to the FDA in its ANDA application, Teva alleged in its amended answer dated October 12, 1999 that the lactose in its formulations did not inhibit hydrolysis. Yet on November 19, 1999, Teva's Senior Vice–President of Research and Development approved the Final Development Report for Teva's 20, 10 and 5 mg. quinapril formulations which stated that the lactose in those formulations "will also inhibit hydrolysis of" quinapril. In recent development of new quinapril formulations, Teva still uses lactose despite the availability of other fillers. It offers four explanations why its formulations prevent hydrolysis by means other than the use of lactose: i) packaging, ii) coating; iii) pH; and iv) methods of manufacture. There is no credible evidence to support these explanations.

In the course of this litigation, Teva had two experts conduct tests in an effort to show that lactose does not inhibit hydrolysis in Teva's quinapril formulations. Dr. Ayres did not test products that were at all comparable to Teva's quinapril formulations, leading to results that Teva's other experts and Dr. Ayres himself would not rely on for the purpose of comparing the functions of lactose in Teva's formulations.

Dr. Goldberg prepared formulation "A" which was said to be Teva's 5 mg. commercial formulation and formulation "B" which was a 6.5 mg. formulation without lactose. Even though higher strength formulations generally exhibit less stability, the non-lactose formulation degraded more via hydrolysis than the formulation with lactose, thus tending to establish that lactose does in fact inhibit hydrolysis.

In opposition to Warner–Lambert's motion for summary judgment of infringement and in support of its motion of non-infringement, Teva urges that Warner–Lambert, which has the burden of proof, has produced no evidence that lactose inhibits hydrolysis, and, in fact, the notebooks of two Warner–Lambert scientists demonstrate a lack of relationship between the amount of lactose and the formulation's ability to inhibit hydrolysis. Dr. Reisch performed stability-testing on formulations with and without lactose, and the formulations without lactose inhibited hydrolysis to a greater extent than those with lactose. Dr. Murthy tested formulations with varying amounts of lactose and found that the formulations with the greater amount of lactose were less effective at inhibiting hydrolysis than formulations with lesser amount of lactose. Teva's interpretation of these tests overlooks the fact that stabilizers like lactose have a "plateau effect" whereby the addition of more stabilizer after it reaches a certain plateau level would not be expected to produce any greater stability.

Teva rightly observes that the similarities of its quinapril formulations to Warner–Lambert's Accupril formulation does not by itself support a finding of infringement. One can prevail on a claim for patent infringement on this basis only if the commercial product is an embodiment

of the patent. *Zenith Labs., Inc. v. Bristol–Myers Squibb Co.*, 19 F.3d 1418 (Fed. Cir.1994). Teva contends that Warner–Lambert has not established that the Accupril formulation is an embodiment of the '450 patent. In fact, Teva contends, Accupril may well be the embodiment of United States Patent No. 6,417,196 ("the '196 patent"). Its independent claim recites:

1. A process for stabilizing a drug quinapril against cyclization which comprises the step of contacting the drug with

(a) a suitable amount of magnesium oxide to retard cyclization, wherein the magnesium oxide is a principal stabilizer; and

(b) One or more saccharides (sic) wherein the saccharides is a hydrolysis-minimizing agent (sic)

Because 40% of magnesium carbonate is magnesium oxide, 25% or more of the Accupril formulation is made up of magnesium carbonate. Teva argues that, therefore, Accupril may embody the disclosures of the '196 patent and not the '450 patent.

Teva cannot reasonably claim that it did not develop its Quinapril formulations with the '450 patent very much in mind. Its personnel knew of the '450 patent since the early 1990's when it was listed in the FDA's "Orange Book" in connection with the Accupril product. The '450 patent is listed in Teva's patent data base as one of the patents covering the Accupril product. When it met in January 1998 to discuss its Quinapril formulations strategy, its Quinapril Team discussed whether in addition to pursuing development of a formulation containing magnesium carbonate and lactose, it should also "develop a totally different formulation in parallel to our current formulation to avoid any potential patent issues with our current strategy." It elected to pursue the course which ran straight into the '450 patent claims. The Excipient Function Report for Teva's Quinapril formulations describes the function of lactose in Teva's formulations as inhibiting hydrolysis, employing the exact words of the '450 patent claims.

Teva's claim that Accupril is an embodiment of the '196 patent makes no sense. The '196 patent was filed more than seven years after Accupril had been in the market. If it covered Accupril, which was discussed in the patent, it would have been invalid on its face. The '196 patented invention is said to provide certain manufacturing advantages compared to the '450 patent and the Accupril formulations.

Warner–Lambert has presented solid evidence that lactose does in fact inhibit hydrolysis. Teva's arguments and theories are insufficient to raise a substantial issue of fact in this regard.

Another ground for Teva's motion for summary judgment of non-infringement of claims 1,4–10, 12, 16 and 17 of the '450 patent implicates the limitations present in each of those claims, calling for "a suitable amount of an alkali or alkaline earth metal carbonate to inhibit cyclization and discoloration." Teva contends that there is *no* evidence that the magnesium carbonate in Teva's formulations inhibits oxidative discoloration, thus entitling it to summary judgment. It also contends that Warner–Lambert has not introduced sufficient evidence that the magnesium carbonate in Teva's formulations inhibits cyclization so as to entitle Warner–Lambert to summary judgment of infringement on those claims.

The "inhibit...discoloration" language of claim 1(b) refers to oxidative discoloration, the only type of discoloration referenced in the '450 patent. It is Teva's contention that Claim 1 requires a functional connection between the presence of an alkali or alkaline earth metal carbonate and the inhibition of oxidation discoloration. "In other words, the carbonate must

operate to inhibit oxidation discoloration in order for the tablet that contains it to come within the scope of Claim 1. Since asserted claims 4–10 and 12 are dependent on Claim 1, they also require the 'inhibit...discoloration' limitation" (Teva Brief in Support at pp. 1, 2).

Teva asserts that there is no evidence that the magnesium carbonate in Teva's formulation inhibits oxidative discoloration. It argues that there is no disclosure in the patent as to how to measure oxidative discoloration or how to ascertain when, or how, it has been inhibited; none of the examples of the patent provide any useful information in this regard; there is no single testing procedure for oxidative discoloration that is recognized by the FDA or by persons of ordinary skill in the art; Warner–Lambert's experts are not certain how a person of skill in the art should conduct such testing and have not conducted any such test on Teva's tablets. Absent the proof of a functional relationship between the "alkali or alkaline earth metal carbonate" in Teva's proposed formulations and the inhibition of oxidate discoloration a required by Claim 1 and its dependents, Teva contends, Warner–Lambert cannot establish infringement of Claims 1, 4–10 and 12 of the '450 patent.

Before evaluating these contentions and the evidence upon which they are based, it is necessary to describe once again how Teva's position on the issue of infringement evolved. In its original answer Teva admitted that its proposed quinapril formulations infringe the '450 patent. This was not surprising, because its ANDA relied upon Warner–Lambert's prior research and Teva sought to compete with Warner–Lambert's well-known Accupril product. Thus at the time the answer was filed Teva admitted that its proposed formulations contained each of the relevant '450 claim limitations, including the limitation at issue on Teva's motion for summary judgment of non-infringement, "a suitable amount of an alkali or alkaline earth metal carbonate to inhibit cyclization and discoloration."

As stated above, a party may, of course, retract or amend an admission if it learns of new facts that establish that its admission was made in error. After answering, Teva came to the belief that its admission of infringement was in error in one respect and informed the Magistrate Judge that the lactose component of Teva's formulation, did not perform the function of inhibiting hydrolysis (see paragraph (c) of claim 1). Warner–Lambert agreed to stipulate to this modification of the admission contained in the Answer.

Thereafter discovery proceeded for two years during which in contention interrogatories and otherwise Teva consistently maintained that the only claim limitation of the '450 patent that it did not meet was the claim limitation "a suitable amount of a saccharide to inhibit hydrolysis." Consequently, Warner–Lambert's deposition discovery, requests for admissions, interrogatories and infringement expert report concentrated on the non-infringement defense with respect to the lactose limitation. In particular Warner–Lambert's questioning of Teva's nine technical personnel concentrated on the lactose limitation and did not address the then uncontested carbonate claim limitation. Teva's contention interrogatories answers were not amended or supplemented to disclose any basis for the non-infringement contention other than the lactose limitation. Long after discovery was closed, and after Warner–Lambert submitted its infringement expert reports, Teva, through its expert, Dr. Gennaro, stated for the first time in its opposition expert report that Teva was asserting a non-infringement defense based on the carbonate limitation of the patent.

Warner–Lambert argues that Teva, having prevented Warner–Lambert from taking fact discovery on this defense, should be precluded from raising it now. *Transclean Corp. v. Bridgewood Services, Inc.*, 77 F.Supp.2d 1045, 1061–4 (D.Minn.1999), *aff'd*, 290 F.3d 1364 (Fed.Cir.2002). This contention has considerable merit. At the very least the circumstances require that Teva's motion for summary judgment be denied to give Warner–Lambert the opportunity to take discovery on the issue, a time consuming process at best. Fed. R.Civ.P.56(f). In view of the lack of merit in Teva's contention of non-infringement, however, its motion will be decided on the merits.

Teva asserts that Warner–Lambert has no proof that discoloration is inhibited in its formulation. To support this assertion Teva states that in order to determine whether a dosage form that is coated with a color film has undergone discoloration, one must open the tablet or crush the tablet and look for a color change. It asserts that neither Warner–Lambert nor Teva has examined Teva's accused products in this manner. Teva further states that its stability "appearance" specification "relates only to the exterior of the finished color-coated dosage form." (Teva Brief in Support at pp. 10–11). The record establishes that these contentions are incorrect. Teva's stability data demonstrate that Teva evaluates the "appearance" of its tablets in connection with stability specifications, in part, by cutting some portions of the tablets "vertically" and observing the color of the "tablet core". In connection with each of its proposed 5, 10, 20 and 40 mg formulations, Teva has cut open tablets, generated data and submitted the data to the FDA, showing that the quinapril in its formulation has not discolored. For example a May 25, 1999 stability evaluation of quinapril tablets reflected, among other things: "Tablet Core cut 6 vertical-

ly"; "1. Color Change—White"; "2. Unusual Change—none".

Teva's contention that one of ordinary skill would not know how to test for discoloration is beside the point. Objectionable discoloration is obvious and is detected by the unaided eye. Oxidation is almost all the time the source of discoloration; discoloration does not always occur; when quinapril undergoes oxidative discoloration it turns pink or purple. These facts have been established by both Warner–Lambert's and Teva's technical people.

As held in the court's *Markman* opinion, the requisite test for inhibition of cyclization and discoloration is: "inhibition of cyclization and discoloration means reducing cyclization and discoloration to a point that a resulting drug product is stable in accordance with generally understood guidelines in existence in 1987 which would meet the requirements for FDA approval." (Slip Opinion at p. 18).

Teva, like Warner–Lambert, had observed discoloration in quinapril. Warner–Lambert's inventors found that magnesium carbonate inhibited that discoloration. Likewise, Teva never observed discoloration in its magnesium carbonate-based formulation. It used magnesium carbonate because it concluded that it ensured chemical and physical stability. It represented to the FDA that magnesium carbonate "stabilizes" its quinapril formulation. Because lactose is claimed to inhibit hydrolysis, magnesium carbonate must be the inhibitor of the only two other kinds of degradation, cyclization and discoloration.

Even more tenuous is Teva's contention, advanced in opposition to Warner–Lambert's motion for summary judgment of infringement, that there is a factual issue as to whether the magnesium carbonate inhibits cyclization. Apart from the belated raising of this contention, no rational

fact-finder could find that magnesium carbonate does not form the stabilizing function of these claims. There are referred to above Teva's documents and representations to the FDA asserting that magnesium carbonate stabilizes quinapril.

The Principal Scientist at Teva during it quinapril development, and the person who reviewed each of the documents referred to above, conceded that stability with respect to inhibition of cyclization is achieved by magnesium carbonate as expressly referenced in these documents. The Director of Analytical R & D at Teva during this time period, Dr. John C. James, who supervised the stability assays of Teva's quinapril formulations, testified that magnesium carbonate performs the claimed function in Teva's quinapril formulations:

> "Q. What role does magnesium carbonate have in Teva's quinapril hydrochloride drug product formulation?
>
> A. What do you mean by "role"?
>
> Q. Why is it included as an excipient?
>
> A. It also is a filler or diluent, and it also inhibits D.P. formation [quinapril impurity formed by cyclization]."

(James Tr. at 47:24–48:6).

Teva's expert, Dr. Goldberg-noting that cyclization was inhibited in his quinapril test formulations, which contained magnesium carbonate, while it was not inhibited in Dr. Ayres's test samples, which turned purple and did not include magnesium carbonate—offered his theory that magnesium carbonate was responsible for this inhibition. (Goldberg 5/30/03 Tr. at 43:25–44:6; Goldberg 2/20/3 Tr. at 155:9–157:13).

In summary, on the extensive record in this case, no rational fact-finder could find that lactose in Teva's quinapril formula-

tions does not inhibit hydrolysis, and no such fact finder could find that the magnesium carbonate in Teva's quinapril formulations does not inhibit cyclization and discoloration. Therefore, Teva's motion for summary judgment of non-infringement of claims 1, 4–10 and 12 will be denied and Warner–Lambert's motion for summary judgment of infringement of claims 1,4–12, 12, 16 and 17 will be granted.

## V. *Validity*

■ Warner–Lambert, noting that Teva based its quinapril formulation development entirely on copying Warner–Lambert's formulation, moves for summary judgment of validity[2]. It relies, in part on the presumption that the claims of the '450 patent are valid, 35 U.S.C. § 282, and the principle that the accused infringer bears the burden of establishing invalidity by the high standard of clear and convincing evidence. *Robotic Vision Systems, Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed.Cir.1999).

■ Each of claims 1, 4–10 and 12 of the '450 patent contain the limitation: "a suitable amount of saccharide to inhibit hydrolysis." The specific saccharide that Teva uses in its proposed commercial quinapril formulations is lactose. Teva relies on the defense of obviousness, 35 U.S.C. § 103. It therefore has the burden of proving by clear and convincing evidence that the differences between the '450 claims and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a); *Graham v. John Deere Co.*, 383 U.S. 1, 13–14, 86 S.Ct. 684, 15 L.Ed.2d 545(1966). In applying the test for obviousness, the claimed invention must be considered as a whole, and every

---

**2.** Technically, the motion might better be viewed as a motion for summary judgment that on the record in this case Teva cannot

carry its burden of establishing invalidity of the '450 patent.

limitation of the relevant claims must be suggested in the prior art. *Litton Indus. Prods. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed.Cir.1985).

Warner–Lambert contends that Teva's own experts "have been consistently and unambiguously clear that they believe this aspect of the '450 patent invention [use of a saccharide to inhibit hydrolysis] to be unobvious even surprising." (Warner–Lambert Brief in Support at p. 6). It cites the deposition testimony of Dr. Joseph B. Schwartz who, when asked about the use of lactose to inhibit hydrolysis in ACE inhibitors, stated: "I do not believe it was apparent to anyone in the art to use lactose to inhibit hydrolysis, and that same statement is [ ]true today. I've never seen another word about it in the literature." Teva's expert, Dr. James W. Ayres, issued a report in which he stated it was not obvious in 1986 to use saccharides to inhibit hydrolysis and that even today he does not see how it is possible to use saccharides for this function.

Teva counters with the assertion that the point of their experts' testimony was not to recognize lactose as a non-obvious innovation in drug formulation because of its ability to inhibit hydrolysis. Instead the object of their testimony was to show that there is no credible evidence that lactose does in fact inhibit hydrolysis. Thus the saccharide claim limitation of claims 1, 4–10 and 12 does not perform the function claimed for it, rendering those claims invalid for lack of utility and as inoperative. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed.Cir.1983).

Teva addresses Warner–Lambert's argument that "[h]aving copied Warner–Lambert's use of the supposedly non-functional lactose, Teva cannot now raise a utility defense." Teva responds, noting that when developing its formulation it did not rely on the '450 patent; rather it sought to develop a formulation that was comparable to Warner–Lambert's Accupril. Teva's end product was bioequivalent to Accupril, but that does not necessarily establish that the lactose in either product performs the function ascribed to it in the '450 patent.

The court has rejected all of Teva's arguments involving the functionality of lactose for the reasons set forth in the previous section of this opinion which deals with the question of infringement. Lactose does serve the function in Teva's formulations of inhibiting hydrolysis. In light of Teva's experts' affirming the lack of obviousness of the saccharide claim limitation Warner–Lambert is entitled to summary judgment of validity of claims 1, 4–10 and 12 of the '450 patent. There is no evidence that the lactose contained in Merck's Vasotec composition serves the function of inhibiting hydrolysis or that Warner–Lambert's inventors thought that it did. Thus Teva's contention that the inclusion of lactose in Merck's composition supports the defense of obviousness lacks merit.

■ Teva's most critical obviousness argument is that claims 16 and 17 of the '450 patent were obvious in light of Merck's Vasotec tablets which were on sale more than one year prior to the filing of the application that led to the issuance of the '450 patent. It is Teva's contention that a person of skill in the art would have found it obvious to substitute "an alkali or alkaline earth metal carbonate" for the sodium bicarbonate in Merck's Vasotec tablets.

The first question that should be resolved is what in fact is the "prior art." Warner–Lambert apparently takes the position that the prior art is limited to that of stabilizing ACE inhibitors, relying on the opinion of its expert Dr. Amidon. Teva's expert, Dr. Schwartz, is of a different opinion, stating that the prior art is considerably more extensive because a formulator

typically works with more than one type of compound during the course of his career. Teva notes that Dr. Schwartz's opinion is buttressed by the fact that during the time in question Warner–Lambert's inventors were working on several non-ACE inhibitor drug compounds. For the purposes of the pending motions Dr. Schwartz's view will be accepted.

It must also be determined what is the ordinary skill in the art. For present purposes Teva has accepted the definition Warner–Lambert advanced during discovery. The level of ordinary skill in the art with respect to the '450 patent was:

> a pharmaceutical formulator, that is a person having a working knowledge of drug development and formulation, who has either an advanced degree in pharmaceutics, chemistry or related science with one or more years of industry experience or a bachelor's degree in pharmaceutics, chemistry or a related science and at least five or more years of industry experience or the equivalent.

This definition of ordinary skill in the art *i.e.,* a pharmaceutical formulator, is consistent with Dr. Schwartz's view of what is the applicable art.

Warner–Lambert urges that under the principle of judicial estoppel Teva should be precluded from contending that carbonates are interchangeable with bicarbonates. In the *Schwartz Pharma Action* Teva's Statement of Material Facts included the assertion: "Under the Court's claim construction, sodium bicarbonate is *not* interchangeable with an alkali or alkaline earth metal carbonate." That was a position Teva maintained throughout the *Schwartz Pharma Action* and contributed to the court's ruling that these classes of compounds are not equivalent. Warner–Lambert asserts that: "… if bicarbonates are distant enough from the '450 claims in Teva's view to escape infringement, then Teva should not now be permitted to reverse course entirely and argue that bicarbonates are now so close to the '450 claims as to render them invalid." (Warner–Lambert's Brief in Support at p. 13).

■ The doctrine of judicial estoppel should not be applied in the instant case. In the first place, Teva's arguments with respect to the equivalency issue in the *Schwartz Pharma Action* are not necessarily inconsistent with its arguments with respect to the obviousness issue in the present case. Further, and perhaps more important, in the instant case Teva has consistently taken the position that the proper construction for the term "an alkali or alkaline earth metal carbonate" should be broad enough to include bicarbonates. In its *Markman* ruling the court disagreed, and, accepting that ruling, Teva pursued its motion in the *Schwartz Pharma Action.* Teva must accept the Court's claim construction as it pursues this case. That necessity, however, should not preclude Teva from advancing its defense that certain combinations of prior art, including Merck's Vasotec formulation, render obvious the claims of the '450 patent as defined by the court.

The Vasotec tablets included enalapril maleate, sodium bicarbonate, lactose, magnesium stearate and starch. Enalapril maleate is one of the ACE inhibitors claimed by the '450 patent. It is now known that the sodium bicarbonate in the Merck Vasotec tablets stabilizes enalapril maleate against cyclization[3]. Merck's Va-

---

3. Dr. Gerald Brenner, Warner–Lambert's expert who was also Merck's Rule 30(b)(6) witness on the subject of Vasotec tablets testified that sodium bicarbonate in Vasotec tablets stabilizes enalapril maleate against cyclization and corroborates contemporaneous documents setting forth data in support of this conclusion. Certain Merck documents explain how the sodium bicarbonate stabilizes enalapril maleate against cyclization.

sotec tablets were approved by the FDA on December 24, 1985 and were on sale more than one year prior to the filing of the application that led to the issuance of the '450 patent.

With respect to claims 1, 4–10 and 12 of the '450 patent which contain the lactose limitation, it cannot be disputed that it was not known in the art in 1987 to employ lactose to inhibit hydrolysis in any type of pharmaceutical formulation. Teva's validity expert, Dr. Schwartz testified that the only function of lactose in the Vasotec formulation is as a filler (Dr. Schwartz Tr. at 144:16–24). Merck's Rule 30(b)(6) witness denied any stabilizing role for lactose in Merck's enalapril formulation (Dr. Brenner Tr. at 83:3–13).

Teva advances several factors to support its position that a person of skill in the art would have found it obvious to substitute "an alkali or alkaline earth metal carbonate" for the sodium bicarbonate in Merck's Vasotec tablets. It cites the opinion of its expert, Dr. Schwartz concerning the obviousness of claims 16 and 17 to the effect that carbonates and bicarbonates "could be used somewhat interchangeably" in pharmaceutical formulations. In his testimony, however, Dr. Schwartz conceded that:

> Just from looking at the listing of ingredients in those foreign publications, Dr. Schwartz would not be able to tell anything about the mechanism by which enalapril is stabilized (Schwartz Tr. at 113:2–114:5);
>
> Just looking at the listing of ingredients, Dr. Schwartz would not know that sodium bicarbonate has *any* role in stabilizing enalapril (*Id.*);
>
> Dr. Schwartz does not know the mechanism by which magnesium carbonate stabilizes ACE inhibitors (*Id.* at 92:3–93:16); and
>
> Dr. Schwartz has no way of knowing whether magnesium carbonate stabilizes quinapril by the same mechanism that

sodium bicarbonate stabilizes enalapril. (*Id.* at 93:17–94:9).

As will be discussed below, Warner–Lambert scientists knew more about Vasotec than the mere list of its ingredients.

Teva cites a memorandum of one of the Warner–Lambert inventors, Dr. Murthy to the effect that:

> The amount of sodium bicarbonate required to increase the pH of the tablet suspension to 5.0 and 6.5 will be determined.
>
> This is based on the presently available information on the solution kinetics of quinapril which suggests that the pH range for the maximum stability of the compound is 4.0 to 8.0. Also Vasotec (Merck's enalapril maleate) tablets are formulated to have a pH of 6.5 through the inclusion of sodium bicarbonate.

This memorandum demonstrates that the amount of the pH of the tablet affects stability and thus that Dr. Murthy knew that Merck used sodium bicarbonate as a stabilizer, even though the memorandum may have been prepared pursuant to Dr. Murthy's failed experiment attempting to employ sodium bicarbonate to stabilize quinapril.

Teva refers to a 1986 article that Merck published which discussed that sodium bicarbonate can be used to prevent cyclization of a drug substance known to cyclize at low pH. The article did not specify the drug under study, but Dr. Brenner testified that the disclosures in the article would lead him to believe the article was about enalapril maleate (Dr. Brenner Tr. at 53:19–55:11) and Dr. Murthy testified that he knew that the authors of the article were working an enalapril (Dr. Murthy Tr. 86:4–24).

 The article is some evidence of obviousness. One of ordinary skill in the art might have considered it to be a disclosure

that sodium bicarbonate could stabilize an ACE inhibitor against cyclization. This is true even though Dr. Brenner was at the time a Merck insider. Insider knowledge of the identity of a drug cannot be attributed to the public at large. *OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed.Cir.1997). However, the revelations in the article and what was publicly known about Merck's efforts to create a pril formulation were public knowledge.

Merck's prior art was a product—enalapril tablets. Claims 16 and 17 of the '450 patent were for a process. It does not appear that there was public disclosure of the process by which Merck stabilized its enalapril tablets against cyclization, although it would hardly require one skilled in the art to conclude that the product was derived from "contacting" its various ingredients with each other.

Another ground for the defense of obviousness of claims 16 and 17 arises out of the European prosecution of the European equivalent of the '450 patent. Because Warner–Lambert's European prosecution is also the basis of Teva's motion for summary judgment that the '450 patent is unenforceable, the details of that prosecution will be set forth at greater length in the section of this opinion devoted to that defense.

Merck received FDA approval to market its enalapril maleate formulation in the United States in 1985. In January 1986 Merck introduced Vasotec, its commercial enalapril maleate formulation, in the United States. Renitec is the trade name that Merck used for its enalapril maleate formulation in France. Warner–Lambert filed the '962 application that led to the issuance of the '450 patent on February 24, 1987. Products on sale on or before February 23, 1986 would be considered prior art, 35 U.S.C. § 102(b).

Warner–Lambert filed a corresponding European Patent Application No. 88 102 643.9 (the "EPO application"). Claim 12 as set forth in the EPO application was the equivalent of claim 16 of the '450 patent. Claim 12, using broader language than claim 16, read:

> A process for stabilizing an ACE inhibitor drug *as defined in claim* 1 against cyclization which comprises the step of contacting the drug with:
>
> (a) a suitable amount of an alkali or alkaline earth metal *salt* and,
>
> (b) one or more saccharides. (emphasis added).

Claim 16 reads:

> A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:
>
> (a) a suitable amount of an alkali or alkaline earth-metal *carbonate* and,
>
> (b) one or more saccharides. (emphasis added).

The Merck enalapril formulation was before the Examiner in Europe. The European Patent Office, having reviewed Claim 12 for "lack of inventive step" (the equivalent of obviousness in United States patent practice), allowed the claim even though it was broader (including an alkaline earth metal *salt*) than its '450 patent counterpart (which included only an alkaline earth metal carbonate). From these developments Warner–Lambert argues that "[t]he European Patent Office's determination that claims of the scope of claim 16 of the '450 patent are non-obvious is persuasive evidence of the non-obviousness of the corresponding U.S. claims" (Warner–Lambert Brief in support at p. 20.)

Warner–Lambert's EPO application claimed the benefit of the filing date of the '962 application. As initially filed Claim 1 of the EPO application was identical to Claim 1 as initially filed in the '962 application. It read:

A pharmaceutical composition which contains:

(a) a drug component which comprise[s] an ACE inhibitor which is susceptible to cyclization, hydrolysis, and discoloration,

(b) a suitable amount of a metal containing stabilizer to inhibit cyclization and discoloration, and

(c) a suitable amount of saacharide to inhibit hydrolysis.

Warner–Lambert revised the language somewhat in response to two rejections. After a third rejection and an interview with the Primary Examiner of the EPO application, Warner–Lambert agreed "to make a disclaimer regarding the Enalapril—composition as disclosed in the Renitec monograph". A new Claim 1 that expressly excluded the Renitec "composition containing for [Claim 1 subparts] (a), (b) and (c) enalapril maleate, lactose and monosodium carbonate [sodium bicarbonate]" was submitted following the interview. Thereafter the EPO application issued as a patent.

After Claim 1 was limited to the use of "alkali or alkaline earth metal carbonate" the European Examiner still believed that Renitec presented a problem of novelty which could be resolved by Warner–Lambert's disclaimers of the enalapril composition. This explanation is reflected in his summary of a meeting he had with Warner–Lambert representatives:

The Application was thoroughly discussed especially the problem of novelty with respect to document DICTIONNAIRE VIDAL 1985, Cahier complementaire, pages 10, 11, O.V.P., "Renitec". The Applicant is willing to make a disclaimer regarding the Enalapril-composition as disclosed in said document. After establishing novelty no other objection are still arising. The Applicant will submit a new set of claims and will adapt the description accordingly.

The parties debate both the meaning and the effect of the disclaimer. However, the close attention that the examiner paid to Vasotec is some evidence relevant to the defense of obviousness. Overall there is evidence supporting the defense of obviousness as applied to claims 16 and 17. There are, therefore, factual issues that preclude summary judgment of validity on those claims.

## VI. *Inequitable Conduct*

Teva has moved for summary judgment that the '450 patent is unenforceable due to Warner–Lambert's inequitable conduct, namely, its failure to disclose to the PTO the existence of a pre-existing drug-Vasotec. Warner–Lambert moves for summary judgment of no inequitable conduct.

The Vasotec product has been discussed in earlier portions of this opinion. The circumstances pertinent to the inequitable conduct defense require further elaboration.

Vasotec, like Accupril, is an hypertensive medication. Its tablet form was first approved by the FDA and it went on the market in January 1986, more than a year before Warner–Lambert filed the application leading up to the '450 patent on February 24, 1987. Before Vasotec's release, there was only one other "pril" on the market, Squibb's Capoten which contained the active ingredient captopril. It was believed that Capoten caused serious adverse effects in patients, and scientists at other companies, including Merck and Warner–Lambert sought to generate a "pril" that did not have the side effects of captopril. While Warner–Lambert's scientists were seeking to develop a stabilized formulation of quinapril, scientists at Merck sought to develop a stabilized formulation of enalapril.

In 1986 Merck published an article which disclosed that sodium bicarbonate can be used to prevent cyclization of a drug substance known to cyclize at low

pH. The article did not specify the drug that was being studied, but one of the '450 patent inventors, Dr. Murthy, testified that he knew that the authors were working with enalapril maleate (Dr. Murthy Tr. at p. 86).

While Merck scientists were working with enalapril, the named inventors of the '450 patent were performing similar work with respect to quinapril. During the months leading up to and after the release of Vasotec Warner–Lambert was preparing the application that resulted in the '450 patent. Before filing that application the named inventors had a meeting during which they discussed Vasotec and decided that it need not be disclosed to the Patent Office. Dr. Murthy explained that because he believed that he invented a narrow invention—a way to stabilize quinapril, not enalapril, with magnesium carbonate—he did not believe that Vasotec was relevant.

However, the originally filed claims 18 and 19 of the '450 patent application were directed to the combination of an ACE inhibitor—not limited to quinapril—with an alkali or alkaline earth metal salt and a saccharide. Claim 18 read:

> 18. A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:
>
> (a) a suitable amount of an alkali or alkaline earth-metal salt and;
>
> (b) one or more saccharides.

The phrase "alkali or alkaline earth metal salt" includes sodium bicarbonate. It was known at the time that Vasotec contained, among other components, enalapril maleate (an ACE inhibitor), sodium bicarbonate (an alkali metal salt) and lactose (a saccharide). It is Teva's contention that based on the facts that Warner–Lambert's inventors knew or should have known it should have been apparent to them that original claim 18 reads on Vasotec, as reflected in the following table that Teva prepared:

| | |
|---|---|
| "A process for stabilizing an ACE inhibitor drug against cyclization" | Vasotec contains enalapril maleate, which is an ACE inhibitor. Vasotec was approved by the FDA and therefore reduced cyclization to the point that Vasotec was sufficiently stabilized to obtain such approval. Therefore, the process of manufacturing Vasotec constitutes a process for stabilizing an ACE inhibitor against cyclization. |
| "which comprises the step of contacting the drug with:" | The ingredients of Vasotec are mixed using a wet granulation process. |
| "a suitable amount of an alkali or alkaline earth-metal salt, and," | Vasotec contains sodium bicarbonate which is an alkali metal salt. Merck demonstrated that the amount of sodium bicarbonate employed in Vasotec was sufficient to stabilize the tablet. |
| "one or more saccharides". | Vasotec contains lactose which is a saccharide. |

Claim 19 of the application claimed:

19. The process of claim 18 wherein the drug is selected from the group consisting of quinapril, enalapril, and indolapril, or a pharmaceutically acceptable acid addition salt thereof.

Teva asserts that since the enalapril maleate in Vasotec is a pharmaceutically ac-

ceptable acid addition salt of enalapril, Vasotec also satisfies all of the limitations set forth in claim 19.

In the issued '450 patent claims 18 and 19 became claims 16 and 17, which read:

16. A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:

 (a) a suitable amount of an alkali or alkaline earth-metal carbonate and;

 (b) one or more saccharides

17. The process of claim 16 wherein the drug is selected from the group consisting of quinapril, enalapril, and indolapril, or a pharmaceutically acceptable acid addition salt thereof.

The difference between original claims 18 and 19 and issued claims 16 and 17 is the change from the term "an alkali or alkaline earth-metal salt" to the term "an alkali or alkaline earth metal carbonate". The court has construed the term "an alkali or alkaline earth metal carbonate" to exclude sodium bicarbonate. Thus, the Vasotec prior art does not meet one limitation of issued claims 16 and 17, as those claims have been construed.

Teva contends that "as demonstrated above, the Vasotec prior art does meet every other limitation of the issued claims 16 and 17. Moreover, the similarities between sodium bicarbonate and carbonates such as sodium carbonate or potassium carbonate raised a serious issue whether it would have been obvious to a person of ordinary skill to substitute 'an alkali or alkaline earth metal carbonate' for the sodium bicarbonate in order to get the same stabilizing result ... In light of these similarities, the Vasotec prior art 'would clearly have been important to a reasonable examiner' " (Teva Brief in Support at pp. 13, 14).

■ Inequitable conduct is an issue of law based on two factual findings; i) materiality, which may be implicated by either an affirmative misrepresentation of a material fact, a failure to disclose material information, or a submission of false material information and ii) an intent to deceive. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed.Cir.1997). Materiality and intent must be established by clear and convincing evidence.

Because the application leading to issuance of the '450 patent was filed prior to 1992, information is deemed material if there is a "substantial likelihood that a reasonable examiner would have considered it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a) (1987); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179 n. 8 (Fed.Cir.1995). "[M]ateriality is determined from the viewpoint of a reasonable patent examiner, and not the subjective beliefs of the patentee." *Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.*, 326 F.3d 1226, 1238 (Fed.Cir.2003).

■ Teva has established that a reasonable examiner would have considered the Vasotec product important in deciding whether to allow the application to issue as a patent. It was the most complete combination of elements of the claimed invention in the prior art. It related significantly to the issue of obviousness. As recited above Vasotec anticipated two of the claims set forth in Warner–Lambert's original application that led to the issuance of the '450 patent. Materiality is determined by comparing the withheld reference to claims that were presented to the PTO at any time during the prosecution. *Fox Indus. Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 803–04 (Fed. Cir.1990).

Even if Warner–Lambert's original application had contained the narrower language that now appears in claims 16 and

17, information concerning Vasotec would still have been material, and it remained material after the amendment of the broader language.

The contents of Vasotec were known at the time Warner–Lambert was pursuing its application. They included enalapril maleate, sodium bicarbonate and lactose. Obviously they had to be mixed together to produce a tablet. Warner–Lambert argues that the mere listing of Vasotec's ingredients does not permit any conclusion to be made as to the function of sodium bicarbonate in that formulation. It is now acknowledged that sodium bicarbonate does in fact stabilize enalapril maleate against at least cyclization. There was enough contemporaneous information as to the similarities between sodium bicarbonate and carbonate to raise an issue whether it would have been obvious to a person of ordinary skill in the art to substitute an alkali or alkaline earth metal carbonate for sodium bicarbonate in order to achieve the same stabilizing result. Dr. Murthy performed experiments comparing Vasotec with quinapril and in May 1986 reported the results of these experiments to other inventors. This contemporaneous information was sufficient to lead Dr. Murthy to attempt to develop a quinapril formulation using sodium bicarbonate. The fact that the particular experiment failed does not detract from the materiality of the use of sodium bicarbonate in the Vasotec product.

Warner–Lambert further argues that original claims 18 and 19 and present claims 16 and 17 are process claims and Vasotec is a product. This distinction does not negate the materiality of information concerning Vasotec. Quite obviously Vasotec resulted from a process which had to be very similar to the process described in those claims, namely "the step of contacting the drug with [its components]." Accupril was the product of the contacting process of claims 16 and 17 and Vasotec was the product of whatever contacting process Merck used. An examiner would not have withheld further inquiry because claims 16 and 17 were process claims and Vasotec was a product.

Dr. Gerald Brenner, Warner–Lambert's technical expert and Merck's Rule 30(b)(6) representative on the topic of its enalapril maleate tablets testified:

Q. The statements that you make in paragraph 71 with respect to magnesium carbonate, are those statements also accurate for sodium and potassium carbonate?

A. I believe we could have stabilized enalapril with—and this is just prediction of mine, without any real data. There were specific reasons we preferred sodium bicarbonate, but I believe we could have stabilized enalapril with sodium carbonate or—what was of the other one, potassium?

Q. Potassium carbonate.

A. I believe we could have, based on our rationale and our approach. But, based on our approach to stabilization, I don't see how we have used magnesium carbonate as the way of doing it.

(Dr. Brenner Tr. pp. 130–131).

Warner–Lambert argues that the composition of Merck's enalapril tablets is set forth in the '829 patent, which was disclosed in the application for the '450 patent, and thus renders Vasotec cumulative. Although the '829 patent discloses many elements of the Merck product, it does not disclose the critical element sodium bicarbonate, nor does it disclose any stability problems associated with enalapril maleate, such as cyclization. Thus Vasotec disclosure would not be cumulative.

Teva contends that during the prosecution of the European application corresponding to the '450 patent the European

**536**

Examiner found Merck's enalapril maleate formulation material and required Warner–Lambert to disclaim that formulation, even though the claims being prosecuted had already been amended to require an alkali or alkaline earth metal carbonate.

Warner–Lambert's description of the course of the European application raises a question whether the European examiner's actions provide further support for a materiality finding. The original broad claim 1 in Europe contained the functional limitations requiring that the carbonate "inhibit cyclization and discoloration" and the saccharide "inhibit hydrolysis." European practice does not permit these types of functional limitations in composition claims. Therefore, Warner–Lambert revised its broad claim 1 to eliminate the functional requirements. This resulted in a claim that was more like a list of ingredients, similar to Merck's enalapril prior art.

The European examiner observed at that point:

> "The examining division agrees with the Applicant that *there is no teaching in the prior art to use the combination of an alkali or alkaline earth metal carbonate and the saccharide to stabilize an ACE inhibitor as claimed in claim 1.* The newly submitted claims, however, are directed to the compositions as such and not to the use of them for said purpose." (emphasis added).

The Vasotec list of ingredients (as set forth in the "Dictionnaire Vidal") was identified in a Search Report dated September 8, 1988 prepared by the European Patent Office. Late in the European prosecution Warner–Lambert's representative met with the European patent examiner to discuss the enalapril reference. During the interview Warner–Lambert agreed to disclaim the enalapril formulation, clarifying that its formulation did not encompass the bicarbonate based enalapril reference. The "list of ingredients" claim, claim 1,

was amended to disclaim that reference. The European examiner did not require amendment of claim 12, a process claim.

As will be discussed below in connection with the "intent" aspect of Teva's defense of inequitable conduct, the mere attention that the European examiner paid to the Merck product is some support for a finding of its materiality. In any event, the other factors referred to above, are sufficient to compel the conclusion that the Vasotec formulation constituted prior art that was material, that is, there was a substantial likelihood that a reasonable examiner would have considered it important in deciding whether to allow the application to issue as a patent.

■ Having found that the Vasotec formulation was highly material information with respect to the prosecution of the application that led to the '450 patent, it is necessary to determine whether withholding this information from the examiner constituted an intent to deceive. "Inequitable conduct resides in [the] failure to disclose material information, or submission of false information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988) (*en banc*). Information is "material" where "there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1575 (Fed.Cir.1996). Proving intent to deceive "means that the inventor intended to deceive or mislead the examiner into granting the patent." *Therma–Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 995 (Fed.Cir.1995); "there must be clear and convincing evidence that the applicant made a deliberate decision to

withhold a known material reference." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1329 (Fed.Cir.1998).

In opposition to Teva's motion for summary judgment that the '450 patent is unenforceable and in support of its own motion for summary judgment of no inequitable conduct, Warner–Lambert urges that:

> Teva's character attack on the Warner–Lambert scientists that invented [the '450 patent], which underlies its inequitable conduct defense, is based on the mere fact that at least one of these inventors, Dr. Murthy, thought that sodium bicarbonate was included in Merck's formulation but did not share this information with the Patent Office. That is it. There is simply nothing more supporting Teva's assault on this now-retired scientist's character.

(Warner–Lambert Brief in Support at p. 1).

Warner–Lambert cites as unrebutted Dr. Murthy's testimony that he did not know what function sodium bicarbonate played in the Vasotec formulation. Warner–Lambert contends that this lack of knowledge together with Dr. Murthy's failed experiments with sodium bicarbonate provide good reason for not disclosing that formulation to Warner–Lambert's attorneys so that they could make disclosure to the Patent Office:

> [W]e were not sure whether sodium bicarbonate was used in [the] enalapril formulation as a stabilizer. When we tried it in our product, it did not work, so we felt that it was not relevant for our application.

(Murthy Transcript at pp. 119–120)

The circumstances bearing upon the question of intent are not as simple as Warner–Lambert portrays them.

In the first place, Warner–Lambert's scientists were pursuing their development of the quinapril formulation in the context of intense competition to introduce a second generation of the "pril" drug class. Until Vasotec's release, the only "pril" on the market was Squibb's Capoten, a drug with the active ingredient captopril. It was believed to cause serious adverse effects, and several pharmaceutical companies, including Merck, Imperial Chemical Industries and Warner–Lambert sought to develop a "pril" formulation that did not have these side effects but still had antihypertensive efficacy.

Merck was the first pharmaceutical firm to achieve the objective. Its tablet form of Vasotec was first approved by the FDA in 1985. It was released to the United States market in January 1986. The application leading to the '450 patent was filed on February 24, 1987. During the period between the release of Vasotec and the filing of Warner–Lambert's application Warner–Lambert's scientists continued their efforts to perfect the quinapril formulation. They must have been fully aware of the FDA's approval of Vasotec and the introduction of Vasotec to the market. They also acquired information about Vasotec's composition. The package insert for Vasotec was circulated within Warner–Lambert's group of scientists. Dr. Murthy is listed as a copy recipient on a memorandum which attaches the enalapril package insert. The additives listed on the package insert included iron oxides, lactose, magnesium stearate and starch. Certain foreign publications, such as Dictionnaire Vidal listed the following as ingredients of Merck's enalapril tablets; enalapril maleate, lactose, sodium bicarbonate, corn starch, red iron oxide, yellow iron oxide, and magnesium stearate. It has not been established that the Merck inventors were aware of the foreign publications prior to filing the application that lead to the '450 patent. By the time Warner–Lambert filed the application leading to the '450 patent, however, Dr. Murthy knew that

Merck's enalapril formulation contained sodium bicarbonate.

Warner–Lambert argues that this knowledge with respect to sodium bicarbonate may in fact be incorrect. It notes that during its manufacture, the enalapril maleate and the sodium bicarbonate react chemically, changing the composition of finished tablets relative to the starting ingredients. The chemical reaction consumes the sodium bicarbonate and converts the enalapril maleate to a different salt form, enalapril sodium. This phenomenon does not change the fact that the starting ingredient was sodium bicarbonate. That fact, combined with other information, might well be of significance to a patent examiner.

More to the point is Warner–Lambert's contention that "simply knowing that Merck was selling tablets containing an ACE inhibitor would not tell Warner–Lambert, or anyone else for that matter, any of the information relevant to the stabilization of those tablets, including the full composition of those tablets, the process by which they are made, or the mechanisms by which cyclization or other degradation pathways are inhibited in those tablets." (Warner–Lambert Brief in Opposition at pp. 3–4) Warner–Lambert has established through Teva's expert Dr. Schwartz and other evidence that a person skilled in the art could not tell from a mere list of ingredients what function sodium bicarbonate served in the Vasotec formulation.

However, Teva has produced substantial evidence that at least Dr. Murthy, and probably the other Warner–Lambert scientists working on the quinapril formulation, were well aware that sodium bicarbonate played a stabilizing function in the enalapril formulation. Their knowledge went far beyond "the mere fact that at least [Dr. Murthy] thought that sodium bicarbonate was included in Merck's formulation." (Warner–Lambert Brief in Support at p. 1).

While working on a stabilized formulation of quinapril Warner–Lambert scientists knew that Merck scientists were working on stabilizing enalapril. Before Vasotec's release these scientists published a paper describing the role of sodium bicarbonate in inhibiting cyclization. It would have required little reasoning to conclude that this referred to cyclization of enalapril. As noted above, Dr. Murthy performed experiments with Vasotec, comparing it with quinapril.

If there were any doubt that Warner–Lambert scientists knew that sodium-bicarbonate played some stabilizing role in the Vasotec product that doubt would be resolved by Dr. Murthy's May 7, 1986 [4] internal memorandum in which he discussed methods for creating alternative stable formulations of quinapril:

> The amount of sodium bicarbonate required to increase the pH of the tablet suspension to 5.0 and 6.5 will be determined.

> This is based on the presently available information on the solution kinetics of quinapril which suggests that the pH range for the *maximum stability* of the compound is 4.0 to 8.0. *Also Vasotec (Merck's enalapril maleate) tablets are formulated to have a pH of 6.5 through the inclusion of sodium bicarbonate.* (emphasis added)

This memorandum demonstrates, among other things, that Dr. Murthy knew that the starting ingredients of Vasotec included enalapril maleate and sodium bicarbonate; that they were mixed together in order to alter the pH of the tablet; and that the function of the sodium carbonate

---

4. Vasotec had been released to the market in the United States in December 1986.

was to affect the stability of Vasotec. As recited above Dr. Murthy must also have known that Vasotec included lactose.

Warner–Lambert's knowledge of the function of sodium carbonate is also demonstrated by the fact that its scientists experimented with its use. The Comprehensive Summary Report of the quinapril formulation development created at the time the application for the '450 patent was filed stated:

*Preliminary Studies*

The stability of quinapril in solutions buffered to pH's between 5 and 8 supported the theory stated above. The cyclization reaction appeared to be blocked and CJ–928 appeared as the main decomposition product. Therefore, efforts were made to buffer the tablet formulation employing . . . sodium bicarbonate to control pH.

\* \* \* \* \* \*

These mixtures were dried and tested for stability. Again, it was found that cyclization was occurring under accelerated conditions and no evidence of hydrolysis was noted. The results of these preliminary trials indicated that the stability data from solution studies was not directly transferable to solid state formulations. Therefore, the use of buffers to control the pH of tablets was abandoned.

Dr. Murthy testified that "we were not sure whether sodium bicarbonate was used in [the] enalapril formulation as a stabilizer. When we tried it in our product, it did not work, so we felt that it was not relevant for our application." (Murthy transcript at pp. 119–120). Warner–Lambert relies upon the testimony as "a very simple, credible explanation for why [Dr. Murthy] dismissed the relevance of Vasotec and sodium bicarbonate." (Warner–Lambert Reply Brief at p. 9).

There are problems with this explanation. Based upon the Merck scientists'

article known to the Warner–Lambert scientists describing the use of sodium bicarbonate as a stabilizer, based upon Dr. Murthy's May 7, 1986 memorandum, and based upon the fact that Warner–Lambert itself conducted stabilization experiments with sodium bicarbonate, it is difficult to accept Dr. Murthy's subsequent testimony that "we were not sure whether sodium bicarbonate was used in [the] enalapril formulation as a stabilizer." Given his knowledge of Merck's use of sodium bicarbonate as a stabilizer, the failure of "these preliminary trials" gives little support to his conclusion that use of sodium bicarbonate "was not relevant to our application."

The Warner–Lambert scientists discussed the applicability of Vasotec to the '450 patent application which they were about to file and decided not to mention Vasotec to their patent counsel, thus making it unlikely that Merck's enalapril formulation would be brought to the examiner's attention. This was a highly questionable decision. Its questionableness is emphasized by the fact that claims 18 and 19 of the original application were broad enough to include sodium bicarbonate:

18. A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:

(a) a suitable amount of an alkali or alkaline earth-metal salt and,

(b) one or more saccharides

19. The process of claim 18 wherein the drug is selected from the group consisting of quinapril, enalapril, and indolopril, or a pharmaceutically acceptable acid addition salt thereof.

Although original claims 18 and 19 are process claims, the process of manufacturing the product Vasotec must have comprised "the step of contacting the drug [enalapril maleate] with: (a) a suitable amount of an alkali or alkaline earth metal

salt [sodium bicarbonate] and (b) one or more saccharides [lactose]." It is truly extraordinary that at the time the '450 patent application was filed the Warner–Lambert scientists did not consider Vasotec "relevant to our application."

The obvious relevance persisted even after original claims 18 and 19 were amended and became claims 16 and 17, in which clause (a) read: "a suitable amount of an alkali or alkaline earth-metal carbonate." This excludes sodium bicarbonate, but the similarities between sodium bicarbonate and carbonates such as sodium carbonate or potassium carbonate raised a serious question whether it would have been obvious to a person of ordinary skill in the art to substitute "an alkali or alkaline earth metal carbonate" for the sodium bicarbonate in order to get a more stabilizing result. This is discussed further in the discussion above of Warner–Lambert's motion for summary judgment of validity. As quoted above, Dr. Brenner testified:

Q. The statements that you make in paragraph 71 with respect to magnesium carbonate, are those statements also accurate for sodium and potassium carbonate?

A. I believe we could have stabilized enalapril with—and this is just prediction of mine, without any real data. There were specific reasons we preferred sodium bicarbonate, but I believe we could have stabilized enalapril with sodium carbonate or—what was of the other one, potassium?

Q. Potassium carbonate.

A. I believe we could have, based on our rationale and our approach. But, based on our approach to stabilization, I don't see how we could have used magnesium carbonate as the way of doing it.

(Dr. Brenner Transcript at pp. 130–131)

Warner–Lambert relies on its disclosure to the Patent Office of U.S. Patent No. 4,374,829 ("the '829 patent") to support its

contention that information that disclosure of Vasotec would have provided was merely cumulative rendering the disclosure of Vasotec unnecessary. The '829 patent discloses relevant elements of the composition of Merck's enalapril tablets, including enalapril, enalapril sodium, lactose, corn starch and magnesium stearate. However, the testimony of Dr. Schwartz that Warner–Lambert cites in support of its argument acknowledges that a key element of the Vasotec formulation is not disclosed—sodium bicarbonate:

Q. Sitting here today, with the exception of the coloring agent *and possibly sodium bicarbonate,* can you point to me any other element of Merck's tablet composition that cannot be found somewhere in the disclosure of this '829 patent, regardless of how you characterize this patent?

A. *With the limitations of, I'm looking at only what you pointed out,* my answer has to be I don't see anything. (emphasis added)

(Schwartz Transcript at pp. 125–126)

The '829 patent discloses ACE inhibitor compounds such as enalapril. Unlike Vasotec it does not disclose any stability problems associated with enalapril, such as cyclization, or that sodium bicarbonate or any alkali or alkaline earth metal carbonates can be used to inhibit cyclization. Vasotec cannot be found to be cumulative of the '829 patent.

Each party relies on the European prosecution of the '450 patent not only to support its arguments about materiality, but also to support its position with respect to the issue of inequitable conduct. Warner–Lambert prosecuted the European counterpart to the '450 patent. Teva notes that the European examiner allowed European claim 1, which has the same "an alkali or alkaline earth metal carbonate" language present in claim 1 of the '450 patent, only

after Warner–Lambert amended the claim to exclude the Merck enalapril formulation (which contained sodium bicarbonate and is marketed under the trade name Renitec in France). The European examiner found that the Merck formulation presented a "problem of novelty" to the European counterpart:

> The Application was thoroughly discussed especially the problem of novelty with respect to document DICTIONNAIRE VIDAL 1985, Cahier complementaire, pages 10, 11, O.V.P., "Renitec" The Applicant is willing to make a disclaimer regarding the Enalapril-composition as disclosed in said documents. After establishing novelty no other objections are still arising. The Applicant will submit a new set of claims.

Although Warner–Lambert was required to amend only claim 1, Teva argues that the amendment must be read into European claim 12, the counterpart of claim 16 of the '450 patent. This follows, it contends, from the fact the claim 12 is "[a] process for stabilizing an ACE inhibitor drug *as defined in claim 1 . . .*" (emphasis added).

Warner–Lambert relies on a more detailed history of the European prosecution to negate the inference Teva would have the court draw from the circumstances of the European prosecution. As noted above, the broad claim 1 in that prosecution was similar in scope to issued claim 1 of the '450 patent. It contained the functional limitations requiring that the carbonate "inhibit cyclization and discoloration" and the saccharide "inhibit hydrolysis." Because European practice does not permit these types of functional limitations in composition claims, Warner–Lambert was asked by the European examiner to delete the functional limitations. When that was done, the resulting claim resembled a list of ingredients similar to Teva's enalapril prior art, and

made the enalapril formulation more relevant. As stated by the examiner:

> The examining division agrees with the Applicant that *there is no teaching in the prior art to use the combination of an alkali or alkaline earth metal carbonate and the saccharide to stabilize an ACE inhibitor as claimed in claim 1.* The newly submitted claims, however, are directed to the compositions as such and not to the use of them for said purpose. (emphasis added)

Warner–Lambert's disclaimer of enalapril resolved the examiner's concerns about claim 1, a composition claim. No amendment was required with respect to European claim 12 to overcome enalapril. Claim 12, a process claim, read:

> 12. A process for stabilizing an ACE inhibitor drug as defined in claim 1 against cyclization which comprises the step of contacting the drug with:
>
>> (a) a suitable amount of an alkali or alkaline earth metal salt and,
>>
>> (b) one or more saccharides

Warner–Lambert notes that claim 12, which it asserts was issued over disclosure of the enalapril art, was commensurate in scope with originally filed claim 18 of the '450 patent, the claim which was the broadest presented during the prosecution of the '450 patent. Claim 18 read:

> 18. A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:
>
>> (a) a suitable amount of an alkali or alkaline earth-metal salt and,
>>
>> (b) one or more saccharides

Teva and Warner–Lambert debate the significance of the words "as defined in claim 1" which appear in claim 12 but do not appear in claim 18.

Teva contends that use of those words requires that the disclaimer of enalapril in

claim 1 be read into claim 12. Warner–Lambert counters that only the drug, sub-paragraph (a) of claim 1—and not the disclaimer—is incorporated into European claim 12, and consequently claim 12 is just as broad as claim 18 in the original '450 patent application.

Without resolving these semantic differences, at the very least the consideration which the European examiner gave to the bearing that Merck's Renitec had upon Warner–Lambert's application is evidence of the relevance of Vasotec–Renitec to Warner–Lambert's application submitted to the United States Patent Office.

Factors which constitute evidence of an intent to deceive are:

1. The Vasotec formulation was highly material information with respect to the prosecution of the application that led to the '450 patent.

2. Warner–Lambert's scientists were pursuing their development of the quinapril formulation in the context of intense competition to introduce a second generation of the "pril" drug class to supersede Squibb's Capoten. It is inconceivable that Warner–Lambert's scientists would not have kept themselves informed about what their competitors, including Merck, were accomplishing in the field, reviewing whatever public information was available.

3. Merck's tablet form of Vasotec was released to the United States market in January 1986, after which Warner–Lambert's scientists continued their efforts to perfect the quinapril formulation.

4. A package insert for Vasotec was circulated among Warner–Lambert's scientists, and Dr. Murthy, upon whose testimony Warner–Lambert relies heavily, is listed as a recipient on a memorandum which attached the enalapril package insert. The insert listed a number of the Vasotec ingredients. During the period before February 24, 1987 when Warner–Lambert filed its application resulting in the '450 patent, Dr. Murthy, and undoubtedly the other Warner–Lambert scientists working on the quinapril formulation, became aware that the Vasotec composition included sodium bicarbonate.

5. Dr. Murthy's testimony that "we were not sure whether sodium bicarbonate was used in [the] enalapril formulation as a stabilizer" is contradicted by undisputed evidence, and Warner–Lambert's position that the charge of inequitable conduct "is based on the *mere fact* that at least one of these inventors, Dr. Murthy, thought that sodium bicarbonate was included in Merck's formulation ... [t]here is simply nothing more ..." is simply incorrect.

6. Before Vasotec's release Warner–Lambert's scientists knew that Merck's scientists were working on stabilizing enalapril. Certain of the Merck scientists published a paper describing the role of sodium bicarbonate in inhibiting cyclization, and it required little reasoning to conclude that this referred to cyclization of enalapril.

7. The pH level had a significant effect upon quinapril stability. In his May 7, 1986 memorandum concerning the amount of sodium bicarbonate required to increase the pH of the tablet suspension to 5.0 and 6.5. Dr. Murthy wrote, "[a]lso Vasotec (Merck's enalapril maleate) tablets are formulated to have a pH of 6.5 through the inclusion of sodium bicarbonate." This is totally inconsistent with Dr. Murthy's testimony that "we were not sure whether sodium bicarbonate was used in [the] enalapril formulation as a stabilizer."

Further, the memorandum demonstrates that Dr. Murthy knew that the starting ingredients of Vasotec included enalapril and sodium bicarbonate; that they were mixed together in order to alter the pH of the tablet; and that the function

of the sodium carbonate was to effect the stability of the tablet.

8. Warner–Lambert's scientists' knowledge of the function of sodium carbonate is also demonstrated by the fact that these scientists experimented with its use. The fact that the preliminary trials failed to control cyclization does not alter the fact the Merck's use of sodium bicarbonate apparently had been successful.

9. The Warner–Lambert scientists discussed the applicability of Vasotec to the '450 patent application which they were about to file. They decided not to mention Vasotec to their patent counsel. This was a decision on their part which they must have known would virtually ensure that Vasotec would not be brought to the examiner's attention.

10. Notwithstanding this decision, claims 18 and 19 of the original application leading to the '450 patent were broad enough to include sodium bicarbonate.

Warner–Lambert has advanced countervailing arguments with respect to the inferences to be drawn from these factors. A party asserting an unequitable conduct defense has a heavy burden of proof. It has been held that there is no inequitable conduct despite admitted materiality of withheld prior art where the inventor believed the subject prior art would not work in his invention. *Modine Mfg. Co. v. Allen Group, Inc.*, 14 USPQ 2d 1210, 1215–16 (N.D.Cal.1989), *aff'd*, 917 F.2d 538 (Fed. Cir.1990). Even if a patentee has been grossly negligent in failing to disclose highly material art there may be a finding of no inequitable conduct. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 552 (Fed.Cir.1990)

There are issues of material fact in regard to the question of the existence of an intent to deceive by reason of Warner–Lambert's failure to disclose the existence of Vasotec to its attorneys and thus to the PTO. Consequently Teva's motion for summary judgment that the '450 patent is unenforceable due to Warner–Lambert's inequitable conduct and Warner–Lambert's motion for summary judgment of no inequitable conduct will both be denied.

## VII. *Teva's Motion to Strike, Etc.*

Teva moved to strike Warner–Lambert's defenses relating to Teva's allegations of inequitable conduct or, in the alternative, for an order that Warner–Lambert has waived the attorney-client privilege by asserting these defenses. The basis of Teva's claim of inequitable conduct is set forth above. Teva notes that Warner–Lambert contends that the named inventors acted in good faith and were so convinced that Vasotec was not material to their application for a patent that they decided it was not necessary to disclose its existence to their attorneys. Dr. Murthy's testimony about what the inventors did not discuss with Warner–Lambert's attorneys, according to Teva, constituted a waiver of the attorney client privilege requiring disclosure of what they did discuss with the attorneys. Having failed to disclose the content of these discussions, Teva argues, either Warner–Lambert's defenses to the inequitable conduct allegations must be stricken or else full disclosure of the matters discussed with the attorneys must be made.

Teva relies upon the well-recognized principle that the attorney-client privilege cannot be used as a shield and a sword. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir.1991). For example a party cannot claim that he acted in good faith because he relied on the advice of counsel and then refuse to disclose what the communications between the attorney and client were. That is a very different situation from the situation presented in the instant case. Dr. Murthy testified that the inventors decided not to provide information to their attorneys. Their good

faith is not claimed as a result of attorney-client communications. To the contrary, their failure to discuss Vasotec with their attorneys can be considered as some evidence of bad faith.

The basis of Warner–Lambert's good faith claim was that as a result of their experiments with sodium bicarbonate to stabilize quinapril "it became clear that quinapril, in the presence of sodium bicarbonate, continued to degrade unacceptably and, thus, sodium bicarbonate [a key component of Vasotec] was abandoned as a potential stabilizer." (Warner–Lambert Opposition Brief at pp. 2, 3).

There was no attorney-client communication that Warner–Lambert relied on concerning Vasotec. Thus no attorney-client communication was at issue and the privilege has not been waived. *Rhone–Poulenc Rorer Inc., v. Home Indemnity Co.*, 32 F.3d 851, 863 (3d Cir.1994). Teva's motion to strike Warner–Lambert's defenses relating to Teva's allegations of inequitable conduct and its alternative motion for an order that Warner–Lambert has waived the attorney-client privilege by asserting these defenses will be denied.

## VIII. *Teva's Motion to Add an Inequitable Conduct Defense*

Teva moves pursuant to Fed.R.Civ.P. 15(a) for leave to amend its answer to add an additional unenforceability defense, claiming that during the prosecution of the '450 patent the patentees and prosecuting attorney made material and intentional misrepresentations to the PTO concerning the inventorship of the '450 patent.

The proposed amended answer alleges that initially Warner–Lambert and British Imperial Chemical Industries, PLC ("ICI") collaborated in an effort to develop a quinapril formulation. Working independently of each other, each company sought to determine how to stabilize quinapril. It is Teva's contention that ICI sci-

entists, who were concentrating on use of an excipient blend to achieve quinapril stability, conceived the idea of using magnesium carbonate for the quinapril formulation. If so, Teva argues, it constituted inequitable conduct not to list as an inventor the scientist or scientists at ICI who first arrived at the solution to the stability problem. Teva has been unable to obtain discovery from ICI personnel and supports its theory by reference to a December 22, 1986 document produced from Warner–Lambert's files. It reads in part:

> The magnesium carbonate-lactose quinapril formulation is the most stable and most reliable, from a manufacturing process perspective, of all the possibilities revealed by the Warner–Lambert—ICI preformulation program.

Inventorship, "as a critical requirement for obtaining a patent, ... is material." *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed.Cir. 2000). An application for a patent must be made by or on behalf of the actual inventor or inventors of the claimed subject matter. 35 U.S.C. § 111. When an invention is made by two or more persons jointly, they shall apply for a patent jointly. 35 U.S.C. § 116. "Examiners are required to reject applications under 35 U.S.C. § 102(f) on the basis of improper inventorship." *Perseptive Biosystems, Inc.*, 225 F.3d at 1321.

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, a futile motion to amend should be denied, *id* at 182, 83 S.Ct. 227. An amendment is futile "if the amended pleading could not survive a motion for summary judgment." *e.g., Wilson*

*v. American Trans Air, Inc.,* 874 F.2d 386, 392 (7th Cir.1989).

 The full panoply of facts pertinent to this case has been developed in support of and in opposition to the motions for summary judgment disposed of above. In Part VI of this opinion there has been discussed the heavy burden a party alleging inequitable conduct must bear to establish materiality and intent to deceive. Were Teva permitted to file an amended answer asserting the new inequitable conduct defense, Warner–Lambert, in light of the extensive record in this case, would be entitled to summary judgment in its favor on the defense. This is an unusual Rule 15(a) motion in that it was filed several years after the date the scheduling order fixed as the deadline for amendment of the pleadings, October 12, 1999. Discovery has been completed and the facts fully developed. In these circumstances a ruling on the question of futility is facilitated.

The new charge is based on nothing more than the fact that at one time Warner–Lambert and ICI engaged in a collaborative effort to develop a stabilized quinapril formulation, a collaboration that terminated before a stable product was developed. The supporting evidence is a memorandum from Warner–Lambert's file that is totally uninformative as to the identity of the person who first proposed to use magnesium carbonate as a quinapril stabilizer. Teva's own expert conceded that the memorandum does not show that the idea to use magnesium carbonate was ICI's. There is absolutely no evidence pointing to an intent to deceive.

In these circumstances Teva's motion for leave to amend its answer to add an additional inequitable conduct defense will be denied as futile.

## IX. *Conclusion*

For the reasons set forth above the various motions will be disposed as follows:

Teva's motion for a summary judgment of non-infringement of claims 1, 4–10 and 12 of the '450 patent will be denied. Warner–Lambert's motion for summary judgment of infringement of claims 1, 4–10, 12, 16 and 17 of the '450 patent will be granted.

Warner–Lambert's motion for a summary judgment of validity of claims 1, 4–10 and 12 of the '450 patent will be granted. Warner–Lambert's motion for summary judgment of validity of claims 16 and 17 will be denied.

Teva's motion for summary judgment that the '450 patent is unenforceable due to Warner–Lambert's inequitable conduct will be denied. Warner–Lambert's motion for summary judgment of no inequitable conduct will be denied.

Teva's motion for leave to amend its answer to add another unenforceability defense will be denied. Teva's motion to strike Warner–Lambert's defenses relating to Teva's allegations of inequitable conduct or, in the alternative, to rule that Warner–Lambert has waived the attorney-client privilege by asserting these defenses will be denied.

There remain for trial the issue of obviousness of claims 16 and 17 of the '450 patent and the issue whether Warner–Lambert withheld from the PTO the existence of Vasotec with an intent to deceive the PTO.

An order will be filed implementing this opinion.

## *ORDER*

Plaintiff, Warner–Lambert Company ("Warner–Lambert") and defendant, Teva Pharmaceuticals USA ("TEVA"), having filed motions concerning: (i) infringement and validity of Warner–Lambert's U.S. Patent No. 4,743,450 ("the '450 patent"), (ii) the enforceability of the '450 patent,

(iii) amendment of Teva's answer to add another unenforceability defense, and (iv) striking Warner–Lambert's defenses to the allegation of unenforceability or, in the alternative, to rule that Warner–Lambert has waived its attorney-client privilege by asserting those defenses; and the court having considered the submissions of the parties and the arguments of counsel; and for the reasons set forth in an opinion of even date;

IT is this 2nd day of October, 2003;

**ORDERED** as follows:

1. Teva's motion for a summary judgment of non-infringement of claims 1, 4–10 and 12 of the '450 patent is denied.

2. Warner–Lambert's motion for summary judgment of infringement of claims 1, 4–10, 12, 16 and 17 of the '450 patent is granted.

3. Warner–Lambert's motion for summary judgment of validity of claims 1, 4–10 and 12 of the '450 patent is granted. Warner–Lambert's motion for summary judgment of validity of claims 16 and 17 is denied.

4. Teva's motion for summary judgment that the '450 patent is unenforceable due to Warner–Lambert's inequitable conduct is denied.

5. Warner–Lambert's motion for summary judgment of no-inequitable conduct is denied.

6. Teva's motion for leave to amend its answer to add another unenforceability defense is denied.

7. Teva's motion to strike Warner–Lambert's defenses relating to Teva's allegations of inequitable conduct, or, in the alternative, to rule that Warner–Lambert has waived the attorney-client privilege by asserting those defenses is denied.